### UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### (Richmond Division)

| | |
|---|---|
| MUSCO SPORTS LIGHTING, LLC, an Iowa Limited Liability Company, 100 First Ave. West, Oskaloosa, Iowa 52577,<br><br>                    Plaintiff,<br><br>      v.<br><br>STEPHEN WILEY, an Individual, 3513 Knights Run Ct., Midlothian, Virginia 23113, AND SITECO LIGHTING US, INC., 5126 South Royal Atlanta Dr., Tucker, GA 30084,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Musco Sports Lighting, LLC ("Musco Lighting") brings this Complaint for Injunctive Relief and Damages against Defendants Stephen Wiley and Siteco Lighting US, Inc. ("Siteco Lighting").  Musco Lighting alleges the following:

### NATURE OF THE CASE

1.      This is a case about Mr. Wiley and Siteco Lighting's conspiracy to steal Musco Lighting's confidential information, proprietary information, and trade secrets in an attempt to break into the U.S. market for specialized sports-lighting equipment.  Despite signing a Confidentiality and Non-Competition Agreement ("Agreement") with Musco Lighting, Mr. Wiley joined Siteco Lighting, a direct competitor, as President of US Sales—notwithstanding his lack of any management experience.  In short order, he and Siteco Lighting have used the trade secrets and other proprietary information Mr. Wiley acquired at Musco Lighting in a scheme to steal Musco Lighting's customers, business partners, and employees.  Their misconduct has repeatedly breached the Agreement, as well as Virginia tort law and statutes and federal trade-secret law.

2.      Having failed to secure Mr. Wiley's and Siteco Lighting's compliance with the Agreement and applicable law, Musco Lighting now sues for temporary and permanent injunctive relief as well as attorneys' fees, compensatory damages, treble damages, punitive damages, restitution, and all other relief to remedy its injuries.

## PARTIES

3.      Musco Lighting is a wholly owned subsidiary of Musco Corporation and an Iowa limited liability company with its principal place of business located at 100 First Avenue West, Oskaloosa, IA 52577.

4.      Mr. Wiley is a former twenty-plus-year employee of Musco Lighting.   Upon information and belief, Mr. Wiley resides at 3513 Knights Run Court, Midlothian, Virginia 23113 and works for Siteco Lighting out of Virigina.

5.      Siteco Lighting is a Georgia corporation with its principal place of business located at 5126 South Royal Atlanta Drive, Tucker, GA 30084.

## JURISDICTION AND VENUE

6.      The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.   Musco Lighting is a citizen of Iowa, Mr. Wiley is a citizen of Virginia, and Siteco Lighting is a citizen of Georgia.   For the amount in controversy, the value of the lost customers; Musco Lighting's misappropriated confidential information, proprietary information, and trade secrets; and other injuries to Musco Lighting's business exceed $75,000—even though the precise value of all the injuries is difficult to fully quantify.

7.      This Court also has subject-matter jurisdiction over Musco Lighting's federal trade-secret claim under 28 U.S.C. § 1331 and supplemental jurisdiction over the other claims under 28

U.S.C. § 1367 because they are interrelated with, and form part of the same case and controversy as, the federal trade-secret claim.

8.    Venue is proper here under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district, where Mr. Wiley resides.  Upon information and belief, Mr. Wiley works for Siteco Lighting out of this district, and it is in this district that Mr. Wiley breached the Agreement with Musco Lighting, misappropriated Musco Lighting's trade secrets, and conspired with Siteco Lighting against Musco Lighting.

9.    These connections to Virginia also satisfy the requirements of personal jurisdiction under Va. Ann. Code § 8.01-328.1 and the federal Constitution.

## BACKGROUND

### Musco Lighting's Business

10.    Musco Lighting sells, among other things, specialized sports and recreational lighting.  Although dozens of companies sell generalized commercial lighting that can be used for sports and recreational lighting, along with many other purposes, few offer customized sports and recreational lighting equipment.  Musco Lighting offers customized lighting fixtures, poles, control systems, monitoring systems, entertainment and other products related to lighting for sports and recreational facilities.

11.    Even within this specialized industry, Musco Lighting employs a unique business model.  It provides a one-stop-shop experience for its customers.  It customizes its equipment to fit customers' needs and connects the customers with its business partners—architects, contractors, vendors, consultants, and more—to provide a comprehensive suite of sports and recreational lighting services.

12.     This business model relies on two key trade secrets: the Profile Methodology and Scoreboard.  First, Musco Lighting's proprietary Profile Methodology—a twelve-step method refined over decades of experience—allows the company to evaluate customers and potential projects and customize its proposals to fit the customers' needs.  This innovation has substantially improved Musco Lighting's realization rate on leads and has significantly increased business since its implementation.

13.     Second, Scoreboard is a proprietary customer-relationship management system.  It records and arranges Musco Lighting's customers, business partners, past projects, future projects, and pricing models.  It is a library of confidential and proprietary market-research data built up over decades and over 10,000 projects.  Through Scoreboard, Musco Lighting has established a network between its customers and business partners.  This is how it is able to offer its unique, one-stop-shop business model.

14.     Musco Lighting protects its trade secrets and other proprietary information.  It limits employees' access to Scoreboard based on their location and seniority, and it requires both passwords and two-factor authentication to access the database.  The company also only shares the Profile Methodology with sales and executive personnel.  Finally, the company protects all its proprietary information by labeling it as confidential and emphasizing its confidential and proprietary nature to employees.

**Mr. Wiley's Employment at Musco Lighting**

15.     During his lengthy tenure at Musco Lighting, Mr. Wiley became intimately familiar with these trade secrets and other proprietary information.  He began working at Musco Lighting over twenty years ago, starting as an intern before accepting a Sales Coordinator position in Iowa. He later worked as Field Sales Representative and then Senior Sales Representative in North

Carolina and Arkansas before being elevated to Sales Executive in Virginia in 2007.  Mr. Wiley worked as one of only two Musco Lighting Sales Executives in Virginia.  Mr. Wiley was one of company's most successful and longest tenured sales staff.

16.    As a Sales Executive in Virginia, Mr. Wiley was responsible for (1) developing customer relationships; (2) learning customers' business needs and recommending unique, differentiated Musco Lighting products and services; (3) maintaining and strengthening customer relationships through in-person meetings, presentations, and site visits; (4) participating in tradeshows and other conferences to uncover market needs and spread information about Musco Lighting products, and (5) using and updating Scoreboard to monitor and maintain projects.

17.    Mr. Wiley was the face of Musco Lighting not only in the counties where he managed sales, but also to a large degree on a national level.  His counties in Virginia were Fairfax, Prince William, Albemarle, Montgomery, Spotsylvania, Henrico, Stafford, Powhatan, and Tazewell Counties.  This market included many important Musco Lighting customers, such as the Fairfax County Park Authority.

18.    As for Mr. Wiley's national work, he worked closely with a variety of national business partners.  These partners included FieldTurf, Inversity Consulting Engineering, Ascent Engineering, Thompson Engineers, CHS Companies, and Kimley Horn & Associates.  Musco Lighting collaborates with these business partners throughout the country, and Mr. Wiley worked with them both within Virginia and at national trade shows he attended on behalf of Musco Lighting.

19.    To perform his job, Mr. Wiley regularly accessed, and relied upon, Musco Lighting's proprietary information—especially Scoreboard and the Profile Methodology.  Musco Lighting trained Mr. Wiley in how to use its proprietary information, and he eventually became so

proficient that he would train other Musco Lighting employees in its use. Mr. Wiley's use of Scoreboard in particular involved him directly in the firm's market research because he would input market-research data into the database and would rely on the database's market-research data to evaluate customers' goals, resources, and priorities.

### The Agreement

20.    Because Mr. Wiley's job gave him access to some of Musco Lighting's most valued trade secrets, the company asked him to sign a Confidentiality and Non-Compete Agreement as part of his employment. Ex. A. In the Agreement's introduction, Mr. Wiley acknowledged that Musco Lighting is "involved in a highly competitive, research intensive business" and "information of a sensitive, confidential or trade secret nature is an asset of great value to the Company." *Id.* § A. He promised to "treat trade secrets and other confidential information acquired during the course of employment so as to provide and maintain the competitive advantage that the information allows." *Id.*

21.    The Agreement includes, among other things, non-compete, confidentiality, and non-solicitation provisions.

22.    In the non-compete provision, Mr. Wiley agreed to two non-compete clauses. First, he agreed to refrain from "engag[ing], directly or indirectly, in any area in the United States in any business of the same nature as or of a similar nature to the business of" Musco Lighting and not to "accept employment . . . [at] any enterprise engaged in such business." *Id.* § E.1. This clause lasts for one year after the end of Mr. Wiley's employment at Musco Lighting.

23.    In the second non-compete clause, Mr. Wiley promised to refrain from "engag[ing], directly or indirectly, in any area in the United States in any design or marketing activities in the specialized area of sports and recreational lighting" and not to "accept employment" at any

enterprise engaged in that area provided he had been "involved directly in . . . market research in the specialized area of sports and recreational lighting." *Id.* This clause lasts for two years after Mr. Wiley's departure. *Id.*

24.    If Mr. Wiley violated either clause, he agreed that the "non-competition period [would] be extended for the complete term . . . running from the date of any violation." *Id.*

25.    For the confidentiality provision, Mr. Wiley promised "not to use" the proprietary information learned through the course of his employment "at any time except in the interest of the Company." *Id.* § B.1. He pledged "not [to] disclose this information to anyone outside the Company without first obtaining written approval from an officer of the Company." *Id.* Finally, he agreed "not [to] take with him any records, drawings, or papers which would relate to [Musco Lighting's] Proprietary Information" if he left. *Id.* § E.3.

26.    The Agreement defines proprietary information to include "marketing information, [such as] sales or product plans, strategies, tactics, methods, customers, prospects, or market research data." *Id.* § B.1. It also lists "Pricing Policies," "Advertising Lists," and "Marketing Plans" as examples of proprietary information." *Id.*

27.    As for solicitation, Mr. Wiley agreed that "he[,] nor any entity with whom he is at the time affiliated directly or indirectly[,] shall hire or offer to hire or entice away or in any other manner persuade or attempt to persuade any officer, employee or agent of [Musco Lighting] to discontinue his or her relationship with [Musco Lighting]" for the duration of the applicable non-compete clause. *Id.* § E.2. He also pledged to "use his best effort to prevent any other entity with whom he is affiliated from taking any such action" for the same period. *Id.*

28.    The Agreement has four other relevant clauses. Mr. Wiley agreed that (1) he would "be responsible for all of the Company's legal expenses" incurred while enforcing the Agreement,

*id.* § F.3; (2) that any breach of the Agreement by him "would seriously damage the Company and that injunctive relief, in addition to monetary damages, would be necessary and proper to compensate the Company," *id.* § E.4; (3) that Iowa law would govern the contract, *id.* § F.5; and (4) that a court would be authorized "to modify the terms of [the Agreement], including the geographic and temporal elements of the non-competition agreement[,] and to enforce [the Agreement] to the greatest extent allowable by law." *Id.*

29.     This Agreement is valid and remains in force.

**Mr. Wiley's Departure**

30.     After over two decades at Musco Lighting, Mr. Wiley abruptly decided to leave on May 13, 2024.  He told Musco Lighting's CEO, Jeff Rogers, that he was not going to take a position competing with Musco Lighting or where he would need to use its proprietary and confidential information.

31.     More than a month later, Musco Lighting discovered that Mr. Wiley had updated his LinkedIn account to reflect his new job: President of US Sales at Siteco Lighting.  He received this leadership position even though he had no prior management experience.



32.    This was the first Musco Lighting learned of Mr. Wiley's new position.  It then investigated Mr. Wiley's company email account and discovered a letter from Siteco Lighting CEO Alexander Talton offering Mr. Wiley the position of President of US Sales dated April 15, 2024—a month before Mr. Wiley told Mr. Rogers that he would not be competing with Musco Lighting.

33.    In response, Musco Lighting sent both Mr. Wiley and Siteco Lighting a cease-and-desist letter, which included relevant language from the Agreement.  Siteco Lighting assured Musco Lighting that its plans would be very different, and that Mr. Wiley would not gain an advantage from his previous position at Musco Lighting and his access to Musco Lighting's confidential and proprietary information.  Trusting these promises, and Mr. Wiley, Musco Lighting took no further action.

**Siteco Lighting**

34.    Siteco Lighting saw in Mr. Wiley a chance to break into the United States market for specialized sports and recreational lighting by stealing away Musco Lighting's customers, business partners, confidential information, proprietary information, and trade secrets.

35.    Upon information and belief, Siteco Lighting is an affiliate of a German company that produces and sells a variety of lighting products.  Musco Lighting competes with that company in Europe and the Middle East.

36.    Siteco Lighting's parent company recently bought Halliday Lighting, a European contractor specializing in sports lighting.  It then appointed one of Halliday Lighting's leading employees, Mr. Talton, as CEO of Siteco Lighting.  According to advertising received by one Musco Lighting customer, Siteco Lighting developed plans to expand its sports and recreational lighting business in the United States.  It has now begun executing those plans by hiring Mr. Wiley

and using his knowledge of Musco Lighting's confidential information, proprietary information, and trade secrets to solicit Musco Lighting's customers and business partners.

**Improper Conduct**

37.    Siteco Lighting decided that, to break into the US market for specialized sports lighting, it needed Mr. Wiley and, more importantly, Mr. Wiley's knowledge of and access to Musco Lighting's proprietary information, confidential information, and trade secrets.  So it coordinated with him to leave Musco Lighting and become its President of US Sales—ignoring the confidentiality, non-solicitation and non-compete provisions Mr. Wiley had promised to abide by.  Because Mr. Wiley had no prior management experience, there would have been no reason for Siteco Lighting to hire him as its President of US Sales but for his knowledge of Musco Lighting's confidential information, proprietary information, and trade secrets.

38.    Moreover, despite Siteco Lighting's assurances that it had very different plans from Musco Lighting's business and that Mr. Wiley's knowledge of Musco Lighting's proprietary information would not unfairly advantage him, it quickly began advertising its sports lighting business in the United States with Mr. Wiley at the forefront.

39.    Mr. Talton posted an offer on LinkedIn after a natural disaster in Florida to help with sports lighting repairs and directed readers to contact "our US President (Stephen Wiley)." He wrote that the "company mission is to facilitate sports in our community."

40.     Since starting at Siteco Lighting, Mr. Wiley has solicited both a customer and a critical business partner with whom he worked closely at Musco Lighting, and Siteco Lighting solicited a Musco Lighting employee after hiring Mr. Wiley.   All this directly violated the Agreement.

41.     In Virginia, Mr. Wiley solicited the Fairfax County Park Authority, one of his former customers, on behalf of Siteco Lighting.

42.     At a national sales event, Mr. Wiley pitched Siteco Lighting's business to FieldTurf, one of the business partners he worked with while at Musco Lighting.  FieldTurf is both an important business partner and direct consumer for Musco Lighting.  Musco Lighting has sold products to FieldTurf in over fifty projects, and they have collaborated in hundreds of projects. The companies exchange business leads with each other, and when FieldTurf receives a project

that involves sports or recreational lighting, in invariably brings Musco Lighting in to handle the lighting. There has been only a single exception to this rule in recent memory before Mr. Wiley left Musco Lighting. This productive relationship, which Mr. Wiley was a part of at Musco Lighting, is critical to Musco Lighting's continued success. But Mr. Wiley has already successfully diverted two FieldTurf projects away from Musco Lighting—one in Florida and one in Rhode Island.

43.    Upon information and belief, Mr. Wiley, and through him Siteco Lighting, used Mr. Wiley's knowledge of Musco Lighting's proprietary information and trade secrets both in these sales pitches themselves and in developing an overall sales and marketing strategy for Siteco Lighting.

44.    Siteco Lighting did not stop there. Mr. Talton also tried to hire another Musco Lighting sales employee, Brent Castle, after it hired Mr. Wiley. Mr. Talton offered Mr. Castle management over five states, including the territory where he represented Musco Lighting. He also told Mr. Castle that he planned to hire twenty more sales representatives across the country.

45.    This reflects only what Musco Lighting has uncovered so far.

## COUNT I

*Breach of contract by Mr. Wiley*

46.    Musco Lighting repeats and realleges the foregoing paragraphs as if fully restated herein.

47.    Mr. Wiley entered into a valid and enforceable contract with Musco Lighting, the Agreement, which contains a (1) non-compete provision, (2) confidentiality provision, and (3) non-solicitation provision. Mr. Wiley's continued employment at Musco Lighting constituted adequate consideration for the contract.

48.     Musco Lighting has upheld its end of the bargain.

49.     Mr. Wiley breached the non-compete provision by accepting employment as President of US Sales at Siteco Lighting.  In this position, Mr. Wiley directly competes against Musco Lighting in the same market and business and in the area of specialized sports and recreational lighting.  Indeed, he already vies for the same customers and the same projects and is leveraging his knowledge of Musco Lighting's confidential information, proprietary information, and trade secrets to the benefit of Siteco Lighting.

50.     Mr. Wiley breached the confidentiality provision by using Musco Lighting's proprietary information against the company's interest and for the benefit of Siteco Lighting.  He has also disclosed this information to Siteco Lighting without obtaining written approval from a Musco Lighting officer.

51.     Mr. Wiley breached the non-solicitation provision by allowing Siteco Lighting to solicit at least one other Musco Lighting employee (Mr. Castle) shortly after hiring him.  Upon information and belief, Siteco Lighting is using both Mr. Wiley's insider information and name recognition to help in its effort to solicit Musco Lighting employees.

52.     Mr. Wiley's breach of these provisions, both separately and combined, are the proximate cause of Musco Lighting's injuries.

53.     Mr. Wiley's position at Siteco Lighting and his use of Musco Lighting' proprietary information (breaching the non-compete and confidentiality provisions respectively) has allowed Siteco Lighting to divert two lucrative projects with FieldTurf in Rhode Island and Florida.  Mr. Wiley has already solicited at least one other customer that he worked with at Musco Lighting—the Fairfax County Park Authority.  Unless he is stopped by this Court, he will continue to solicit and steal Musco Lighting's customers and business partners.

54.     As for the non-solicitation provision, although to Musco Lighting's knowledge, Defendants have not attempted to hire another employee beyond Mr. Castle, their attempts have already disrupted Musco Lighting's operations.  And Siteco Lighting openly admits it plans to hire twenty more sales representatives, which reveals that these efforts will continue unless stopped by this Court.

55.     The loss of customers, consumer goodwill, business partners, the value of its proprietary information, and stability of its workforce harms Musco Lighting.  Not only has Musco Lighting lost profits and contracts, but Mr. Wiley's breaches have damaged, and will continue to damage, its intangible relationships with customers and business partners and even the success of Musco Lighting's unique business model.  This cannot be compensated by money damages alone.

56.     These injuries are irreparable.  First, Mr. Wiley agreed that breach of the contract amounts to irreparable harm.  *See* Ex. A, § E.4.  Second, the aforementioned injuries will harm Musco Lighting in ways that are substantial yet difficult to precisely quantify.  Because these losses are difficult to measure, damages alone will not fully compensate Musco Lighting for its injuries.

57.     In particular, the threat of future harm from Mr. Wiley's continued breach of the Agreement justifies both a preliminary and permanent injunction requiring Mr. Wiley to abide by the Agreement.

58.     Mr. Wiley's breach also entitles Musco Lighting to payment for all legal expenses, including attorneys' fees, that Musco Lighting incurs to enforce the Agreement.  *Id.* § E.3.

59.     In addition, to the extent this Court concludes that any of the injuries that Musco Lighting has suffered as a result of Mr. Wiley's breaches are compensable at law, Musco Lighting seeks money damages for those losses.

60.     Finally, because Mr. Wiley's breaches were "willful and wanton," and, as explained below, "constitute[ ] an intentional tort committed maliciously," Musco Lighting is entitled to punitive damages.  *Wilson v. Vanden Berg*, 687 N.W.2d 575, 586 (Iowa 2004).

### COUNT II

*Tortious interference with a contract by Siteco Lighting*

61.     Musco Lighting repeats and realleges the foregoing paragraphs as if fully restated herein.

62.     As explained above, the Agreement constitutes a valid contract between Mr. Wiley and Musco Lighting.

63.     Siteco Lighting was aware of the Agreement and its terms.  Musco Lighting sent Siteco Lighting the relevant portions of the Agreement in its cease-and-desist letter, which predated many of the breaches, and it sent a complete copy of the Agreement shortly thereafter.

64.     Siteco Lighting induced Mr. Wiley to breach the Agreement by hiring him into a position that would directly compete with Musco Lighting and prompting him to solicit the same customers and business partners he worked with at Musco Lighting.  Moreover, it knew or should have known that it would be impossible for Mr. Wiley to perform his duties without improperly using the proprietary information he gained at Musco Lighting because that information involved the very customers and business partners that it induced him to solicit.  Finally, it solicited other Musco Lighting employees, which it knew violated the terms of the Agreement.

65.     As detailed above, the inducement of these breaches harmed Musco Lighting by depriving it of customers and business partners while diminishing the value of its proprietary information.  It also threatens to disrupt the stability of Musco Lighting's sales personnel.

66.    Siteco Lighting's inducement caused Mr. Wiley to breach the Agreement because he would not have left Musco Lighting if Siteco Lighting had not offered him the position of President of US Sales.

67.    Musco Lighting suffers, and will continue to suffer, irreparable harm because of Siteco Lighting's tortious interference.  For the same reasons given above, Mr. Wiley's breaches, which Siteco Lighting induced, amount to an irreparable injury.  The threat that these breaches will continue entitles Musco Lighting to both a preliminary and permanent injunction.

68.    Musco Lighting also seeks compensatory damages for any injuries that the Court deems compensable at law.  Musco Lighting is also entitled to punitive damages for these injuries because Siteco Lighting acted with a wanton and reckless disregard of Musco Lighting's rights under the Agreement.

## COUNT III

*Tortious interference with a business expectancy by Mr. Wiley and Siteco Lighting*

69.    Musco Lighting repeats and realleges the foregoing paragraphs as if fully restated herein.

70.    Musco Lighting had a reasonably certain business expectancy in its projects with FieldTurf, including the Rhode Island and Florida projects discussed above.  This expectation derived from Musco Lighting's longstanding relationship with FieldTurf in which they routinely exchanged leads and packaged their services together for sports and recreational lighting projects. Over the decades, they have collaborated on hundreds of projects and, with only a single exception in recent memory before Defendants' interference, FieldTurf has always brought Musco Lighting in when it receives a project involving sports or recreational lighting.

71.     Mr. Wiley and Siteco Lighting knew of Musco Lighting's business expectancy, not least of all because Mr. Wiley had been a part of Musco Lighting's relationship with FieldTurf in his previous position.

72.     Mr. Wiley, acting on behalf of Siteco Lighting, used his knowledge of Musco Lighting's proprietary and confidential information, including trade secrets, to solicit FieldTurf away from Musco Lighting on a project in Florida and another project in Rhode Island.

73.     But for Mr. Wiley and Siteco Lighting's improper interference, Musco Lighting would have received a part of the business from these contracts.

74.     The loss of these business opportunities harmed Musco Lighting, as explained above.

75.     This loss is irreparable, and Musco Lighting seeks both a preliminary and permanent injunction directing Siteco Lighting and Mr. Wiley not to interfere with Musco Lighting's business expectancy in collaborations with FieldTurf.  Beyond simply the lost profits, Musco Lighting has lost out on developing a relationship with potential new customers.  The interference has also undermined Musco Lighting's business relationship with FieldTurf.  As explained above, that relationship is critical to Musco Lighting because the two companies package their products together across the country and exchange business leads.

76.     To the extent that the court finds that any of these losses are at least partially compensable at law, Musco Lighting also seeks compensatory and punitive damages for the losses because the interference was in wanton disregard for Musco Lighting's business expectancy.

## COUNT IV

*Misappropriation of trade secrets under the Virginia Uniform Trade Secret Act, Va. Code Ann. § 59.1-336* et seq*., by Mr. Wiley and Siteco Lighting*

77.    Musco Lighting repeats and realleges the foregoing paragraphs as if fully restated herein.

78.    The Profile Methodology and Scoreboard are trade secrets.  Their secrecy confers independent value because, if competitors learn this information, they could poach Musco Lighting's customers and business partners and even copy its unique business model.  The secrets are not readily ascertainable because they were compiled over decades of painstaking trial and error.  Nor has any other competitor managed to independently derive them.  Finally, Musco Lighting protects these trade secrets by limiting access to only those who need the information to perform their jobs and labeling the information as proprietary and confidential.

79.    Mr. Wiley misappropriated these trade secrets by using them to steal Musco Lighting's customers and business partners.  He had a duty, under both the Agreement and norms of fair business practice, not to use these secrets to undermine Musco Lighting's business.

80.    Mr. Wiley also misappropriated these trade secrets by, upon information and belief, disclosing them to Siteco Lighting.

81.    Siteco Lighting misappropriated Musco Lighting's trade secrets by acquiring them via Mr. Wiley when it knew, or at least should have known, that he had a duty not to disclose them under the Agreement and business norms.  As explained above, because Mr. Wiley lacked any management experience, there was no reason for Siteco Lighting to hire him as its US President of Sales except for his knowledge of Musco Lighting's confidential information, proprietary information, and trade secrets.

82.     Siteco Lighting also misappropriated the trade secrets by using them, through Mr. Wiley, to divert business from Musco Lighting to itself.

83.     The misappropriation of these trade secrets caused Musco Lighting to suffer irreparable harm.  The Profile Methodology and Scoreboard are integral parts of Musco Lighting's unique business model and operation.  Their disclosure and use by a competitor damage the entire network of customers and business partners that Musco Lighting has established over the decades. It will be difficult to measure just how many projects, opportunities, and productive business collaborations Musco Lighting will lose from the misappropriation of these trade secrets.  This entitles Musco Lighting to a preliminary and permanent injunction.

84.     If the Court finds that any of Musco Lighting's injuries from the trade-secret misappropriation are at least partially compensable at law, Musco Lighting seeks compensatory and punitive damages for the diminished value of its trade secrets and restitution for any profits unjustly earned by Mr. Wiley and Siteco Lighting by using the trade secrets.

**COUNT V**

*Misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1832 et seq.,*
*by Mr. Wiley and Siteco Lighting*

85.     Musco Lighting repeats and realleges the foregoing paragraphs as if fully restated herein.

86.     As explained in Count IV, the Profile Methodology and Scoreboard are trade secrets.

87.     These trade secrets implicate interstate commerce because Musco Lighting uses them for projects across all fifty states.

88.     As described in Count IV, Mr. Wiley and Siteco Lighting have misappropriated these trade secrets.  Mr. Wiley has disclosed them to Siteco Lighting in the course of his

employment there and has improperly used them to solicit customers and business partners. Siteco Lighting has done the same through Mr. Wiley and, in addition, improperly acquired the trade secrets by hiring Mr. Wiley in violation of the Agreement.

89.    Finally, as detailed in Count IV, this misappropriation entitles Musco Lighting to a preliminary and permanent injunction as well as compensatory damages, punitive damages, and restitution.

<b>COUNT VI</b>

<i>Common-law civil conspiracy by Mr. Wiley and Siteco Lighting</i>

90.    Musco Lighting repeats and realleges the foregoing paragraphs as if fully restated herein.

91.    As detailed above, Mr. Wiley and Siteco Lighting collaborated to repeatedly breach the Agreement, tortiously interfere with the Agreement, tortiously interfere with Musco Lighting's business expectancy, and misappropriate Musco Lighting's trade secrets. Their conduct was part of a joint scheme to undermine Musco Lighting's business for their own benefit.

92.    Their conspiracy injured Musco Lighting by depriving it of business opportunities, undermining its relationships with customers and business partners, and diminishing the value of its trade secrets and other proprietary information.

93.    As explained above, Musco Lighting seeks a preliminary and permanent injunction because its injury is irreparable. It will be difficult to measure the full value of its lost profits, lost consumer goodwill, lost business relationships, and the diminished value of its proprietary information.

94.     For any injuries that are compensable at law, Musco Lighting seeks compensatory and punitive damages because Mr. Wiley and Siteco Lighting's repeated and intentional misconduct evinces a reckless disregard for Musco Lighting's rights.

**COUNT VII**

*Statutory civil conspiracy under Va. Code Ann. §§ 18.2-499(a) and 18.2-500 by Mr. Wiley and Siteco Lighting*

95.     Musco Lighting repeats and realleges the foregoing paragraphs as if fully restated herein.

96.     As described in Count VI, Mr. Wiley and Siteco Lighting jointly conspired to undermine Musco Lighting's business by using its trade secrets and proprietary information to steal its customers and business partners.

97.     Their conduct was "intentional[ ], purposeful[ ], and without lawful justification." *Advanced Marine Enters. v. PRC. Inc.*, 501 S.E.2d 148, 155 (Va. 1998).  Mr. Wiley and Siteco Lighting were fully aware of the Agreement and the proprietary nature of Musco Lighting's information.  Their misconduct was also repeated.  They diverted two separate projects with FieldTurf, solicited the Fairfax County Park Authority, and solicited Mr. Castle to join their enterprise.  And this is only what Musco Lighting has already uncovered.  Moreover, the entire point of Siteco Lighting hiring Mr. Wiley was to use the confidential and proprietary information he learned at Musco Lighting to steal its customers and business partners.  There was no other reason to hire someone who lacked any management experience as President of US Sales.

98.     As explained above, this conspiracy injured Musco Lighting by denying it access to lucrative business projects, depriving it of customer goodwill, undermining its relationships with customers and business partners, and diminishing the value of its trade secrets and proprietary information.  The conspiracy is the proximate cause of these injuries.

99.     Musco Lighting seeks preliminary and permanent injunctive relief because the continuation of this conspiracy threatens to harm Musco Lighting in ways that will be difficult to fully measure.

100.     Musco Lighting also seeks compensatory and treble damages for any injuries caused by the conspiracy that are measurable.  It also seeks compensation for the full cost of this suit, including attorneys' fees.

## PRAYER FOR RELIEF

101.     Wherefore, Musco Lighting respectfully requests the following relief against Mr. Wiley and Siteco Lighting:

A.     A preliminary and permanent injunction ordering Mr. Wiley not to compete with Musco Lighting in any business of the same nature to or a similar nature as Musco Lighting or in the specialized area of sports and recreational lighting for the duration of the non-compete provision, not to use or disclose Musco Lighting's proprietary information, and not to allow Siteco Lighting to solicit Musco Lighting's employees for the duration of the non-compete period.

B.     An order tolling the duration of the non-compete provision from the date of Mr. Wiley's last violation of the Agreement.

C.     A preliminary and permanent injunction directing Siteco Lighting not to interfere with the Agreement, including the non-compete, confidentiality, and non-solicitation provisions.

D.     A preliminary and permanent injunction directing Mr. Wiley and Siteco Lighting not to interfere with Musco Lighting's established partnerships, including with FieldTurf.

E.    A preliminary and permanent injunction directing Mr. Wiley to refrain from disclosing Musco Lighting's confidential information, proprietary information, and trade secrets to Siteco Lighting.

F.    A preliminary and permanent injunction ordering Mr. Wiley and Siteco Lighting not to use, disclose, or improperly acquire Musco Lighting's trade secrets, particularly with respect to Scoreboard and the Profile Methodology.

G.    A preliminary and permanent injunction enjoining Mr. Wiley and Siteco Lighting from conspiring to breach the Agreement, interfering with Musco Lighting's longstanding business partnerships, or misappropriating its trade secrets and proprietary information.

H.    An award of compensatory, treble, and punitive damages arising from the aforementioned unlawful conduct where such damages are measurable, as well as restitution for Siteco Lighting and Mr. Wiley's unjust enrichment from Musco Lighting's trade secrets.

DATED: 12/6/2024                    Respectfully submitted,

                                   /s/ Olivia Houston
                                   Olivia Houston (VSB #95824)
                                   Edward Scheideman (*pro hac vice* forthcoming)
                                   Sergio Valente (*pro hac vice* forthcoming)
                                   DLA Piper LLP (US)
                                   500 8th Street, N.W.
                                   Washington, D.C. 20004
                                   (202) 799-4253
                                   olivia.houston@us.dlapiper.com
                                   edward.scheideman@us.dlapiper.com
                                   sergio.valente@us.dlapiper.com

                                   Micala Bernardo (*pro hac vice* forthcoming)
                                   1900 N. Peart St. Suite 2200
                                   Dallas, TX 75201
                                   (214) 743-4561
                                   micala.bernardo@us.dlapiper.com

                                   *Counsel for Plaintiff*

# Exhibit A

# CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

A.    Introduction

Musco Corporation, together with all of its subsidiary companies (hereinafter collectively called the "Company"), are involved in a highly competitive, research intensive business. Accordingly, information of a sensitive, confidential or trade secret nature is an asset of great value to the Company. The purpose of this agreement, and others like it, is the protection of this valuable asset. The continued success of the Company depends to a great extent on the manner in which both the Company and its employees treat trade secrets and other confidential information acquired during the course of employment so as to provide and maintain the competitive advantage this information allows.

It is therefore in the best interests of both the employee and the Company to protect information developed by the Company through its employees, either by patents or holding such information secret or confidential.

All employees of the Company have a responsibility to protect proprietary information and thereby contribute to the continued success of the Company. This agreement is executed by the employee in consideration of his present and continuing employment by the Company.

B.    Agreement Regarding Proprietary Information

Without limiting either the employee's or the Company's rights to terminate employment and in consideration of the continued employment of the employee and the benefits and salaries paid to the employee, the parties agree as follows:

1.    The employee hereby acknowledges that he has learned and/or has been given access to Proprietary Information, as defined in Section B(2) below, vital to the success of the Company. The employee agrees not to use this Proprietary Information at any time except in the interest of the Company. The employee shall not disclose this information to anyone outside the Company without first obtaining written approval from an officer of the Company.

2.    Proprietary Information encompasses all types of information capable of providing the Company with a competitive advantage. Proprietary Information includes, among other things, the following types of information, both existing and contemplated, and regarding the Company: corporate information, including contractual licensing arrangements, plans, strategies, tactics, policies, resolutions, patent applications, and any litigation or negotiations; marketing information, including sales or product plans, strategies, tactics, methods, customers, prospects, or market research data; financial information, including cost and performance data, debt arrangement, equity structure, investors, and holdings; operational information, including trade secrets, secret formulae, control and inspection practices, manufacturing processes and methods, suppliers and parts; technical information, including machinery designs, drawings and specifications; computer system information, including access phone numbers, codes and passwords; and personnel information, including personnel lists, resumes, personal data, organizational structure and performance evaluations. Proprietary Information often falls under three broad categories. These categories are listed below, along with examples of items that would fall into each:

| Business and Financial Information | Research and Development | Operational Information |
|---|---|---|
| Customer Lists | Discoveries | Manufacturing Techniques |
| Rep Lists | Inventions | Know-how |
| Pricing Policies | New Designs | Quality Control Techniques |
| Pricing Procedures | Models | Scheduling Methods |
| Financial Reports | Technical Improvements | Formula for Above |
| Advertising Lists | Drawings | Production Application |
| Marketing Plans | Drawing Changes | Methods |
| Price Lists | | Inventory Lists |
| Product Costs | | |
| Market Statistics | | |
| General Market Information | | |
| Trade Show Lists | | |
| Computer Systems Information | | |

3.     The employee agrees that upon termination of the employee's employment with the Company, the employee will grant his immediate supervisor an exit interview during which the supervisor will examine all documents the departing employee desires to remove from the Company premises as well as all documents not on Company premises but in the employee's possession or control that are related in any way to the business of the Company. Such examination will be conducted to determine if these documents may be retained by the employee in compliance with this agreement, and the employee agrees to abide by the determination of the supervisor. In addition, upon termination of his employment with the Company, the employee agrees to advise his immediate supervisor of any information, written or otherwise, of the nature described in paragraph 2 above, which he provided to others prior to his departure.

C.     Inventions and Discoveries

The employee and Company agree:

1.     The employee will promptly disclose to the Company all inventions, discoveries and improvements, whether patentable or not, made or conceived during the time the employee is employed by the Company, which are within or in any way related to the existing or contemplated scope of the business of the Company. An invention, discovery or improvement shall be deemed to have been made while the employee is employed by the Company if it is made or conceived within six months after the termination of employment and results from or was suggested by employee's employment by the Company.

2.     The employee will upon request assign to the Company or to any other party designated by the Company any or all of said inventions, discoveries or improvements, any patent applications filed thereon, together with all extensions, re-issues and renewals thereof in this and in all foreign countries; the employee will promptly execute all proper papers for these purposes and for use in applying for, obtaining and maintaining all such patents as the Company may request. The employee's obligation to execute the papers and assignments specified in this paragraph shall continue beyond the period of his employment and shall bind his heirs, assigns, executors, administrators and other legal representatives.

2

D.    Publications

Often, publications by employees are encouraged and desirable. However, in order to assure that any publication will not disclose proprietary information, the employee will submit any proposed publication to a Company officer for approval before submitting it to a publisher. The Company agrees that approval will not be withheld unless the information would offer a potential competitive disadvantage to the Company.

E.    Non-Competition

1.    For a period beginning upon the termination of the employee's employment with the Company, and for a period of one year thereafter, the employee will not engage, directly or indirectly, in any area within the United States in any business of the same nature as or of a similar nature to the business of the Company, nor will the employee accept employment, consult for or participate directly or indirectly in the ownership or management of any enterprise engaged in such a business. However, employees involved directly in the specialized engineering or technical design of sports and recreational lighting products or systems, or in market research in the specialized area of sports and recreational lighting, upon termination and for a period of two years thereafter, will not engage, directly or indirectly, in any area within the United States in any design or marketing activities in the specialized areas of sports and recreational lighting, nor will such employees accept employment, consult or participate directly or indirectly in the ownership or management of any enterprise engaged in the specialized area of sports and recreational lighting. If any employee violates the terms of this paragraph, this non-competition period will be extended for the complete term of the employee's non-competition period running from the date of any violation.

2.    The employee agrees that during the non-competition period described in paragraph E(1), neither he nor any entity with whom he is at the time affiliated directly or indirectly shall hire or offer to hire or entice away or in any other manner persuade or attempt to persuade any officer, employee or agent of the Company to discontinue his or her relationship with the Company and that he will use his best effort to prevent any other entity with whom he is affiliated from taking any such action.

3.    The employee agrees that if he should for any reason leave the Company, he will not take with him any records, drawings or papers which would relate to the Proprietary Information.

4.    The employee acknowledges that any breach of this agreement on his part would seriously damage the Company and that injunctive relief, in addition to monetary damages, would be necessary and proper to compensate the Company.

F.    Miscellaneous

1.    This agreement shall inure to the benefit of the Company and its successors and assigns. This agreement shall be binding upon the employee and his heirs, executors and administrators.

2.    The employee agrees that if the employee is contacted by any person requesting him to release information or participate in any activities that would constitute a violation of this agreement, then the employee will immediately notify Joe P. Crookham or Myron Gordin of all circumstances of such contacts.

3.      The employee agrees that if it is necessary for the Company to incur legal expenses, including attorney's fees, to enforce or defend the enforceability of this agreement, and if the Company prevails, the employee will be responsible for all of the Company's legal expenses.

4.      This agreement constitutes the entire agreement between the Company and the employee relating to this employment and the additional matters provided for herein. This agreement may be amended or altered only by written agreement of the employee and the Company.

5.      This agreement shall be governed by and construed in accordance with the laws of the State of Iowa. Each provision of this agreement is severable from the others, and if any provision hereof shall be to any extent unenforceable, it and the other provisions hereof shall continue to be enforceable to the full extent allowable. The intent of the parties in executing this agreement is that the Company be afforded the fullest protection allowable by law. The parties therefore agree that the post-employment restrictions on the employee, including the agreement regarding Proprietary Information contained in Section B, and the non-competition agreement contained in Section E, should be enforced to the fullest possible extent. The parties expressly authorize any court reviewing this agreement to modify the terms of this agreement, including the geographic and temporal elements of the non-competition agreement and to enforce this agreement to the greatest extent allowable by law.

6.      This agreement supersedes and replaces any previously executed agreements.

Signed on behalf of the Company and by its employee on this _20_ day of _June_, 2003.

_____, Employee

MUSCO CORPORATION AND ITS
SUBSIDIARIES

_Cassie Barber_
By:     Cassie Barber
Title   HRAC

4